UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 22-cr-00031 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| KENDRICK RIGGINS (01)<br>SHAHEED DAVIS (02)<br>RICKY LAWSON (03)<br>MYRNA B GRAYS (04) | MAGISTRATE JUDGE HORNSBY |

**REPORT AND RECOMMENDATION**

**Introduction**

Defendants Kendrick Riggins, Shaheed Davis, Ricky Lawson, and Myrna Grays are each charged with conspiracy to distribute narcotics and possession with intent to distribute cocaine. Davis is also charged with one count of possession of a firearm by a convicted felon. The charges arise out of simultaneous traffic stops of two vehicles. Before the court are three motions to suppress (Docs. 39, 44, & 45)[1] filed by the defendants. For the reasons that follow, it is recommended that the motions be denied.

**Relevant Facts**

A hearing was held on the motions to suppress. The following facts were established by credible evidence. On January 12, 2022, at around 3:30 in the morning, Louisiana State Trooper Abry Cahn was on patrol on I-20 in Bossier Parish. Two members of his team, Trooper Justin Wardell and Trooper Colton Derrick, were also on patrol in the

---

[1] The first motion (Doc. 39) was filed by Riggins and adopted by Davis. The second motion (Doc. 44) was filed by Lawson, and the third motion (Doc. 45) was filed by Grays.

area. Tr. 7-8. Cahn saw a black Ford Expedition traveling in the right lane with a blue Nissan Versa traveling behind it. As the vehicles topped a hill, the Versa accelerated until it was about one car length behind the Expedition. Tr. 8-9. Cahn watched the vehicles as they traveled east, then began to follow them. Tr. 10.

After he began following the vehicles, Cahn saw the Versa cross the fog line. The two vehicles moved from the right lane to the left lane even though there was no other traffic on the interstate. The vehicles made several other lane changes as they continued eastbound. Each time, the Expedition changed lanes first and the Versa followed. Tr. 10. The Expedition also crossed the fog line twice. Tr. 31-32.

Cahn contacted Trooper Wardell, who was on patrol in the area, and told Wardell that the two vehicles were travelling together and that the vehicles committed the infractions of following too closely and improper lane usage. Cahn said that he would stop the Expedition, and Wardell said that he would stop the Versa. Tr. 83.

Cahn activated his lights and stopped the Expedition. Tr. 11. The Expedition pulled over, and the Versa continued eastbound. Tr. 17. Cahn approached the passenger side of the vehicle. He noticed that the back windows of the Expedition were darkly tinted, and he could not see through them. The passenger window was rolled down, and Cahn smelled the odor of marijuana from within the vehicle. Tr. 13.

Defendant Kendrick Riggins was driving the Expedition, and defendant Shaheed Davis, who owned the vehicle, was in the passenger seat. Tr. 14. Davis was looking at the floor and did not make eye contact with Cahn. Cahn asked if the Versa was travelling with them, and after a pause, Davis said he was not. Riggins did not make eye contact with

Cahn and his eyes were wide as if he was startled. Tr. 15. Riggins gave Cahn his driver's license. Cahn asked Riggins to step out of the vehicle and go to the rear bumper of the Expedition. Tr. 15.

Cahn told Riggins the reason for the stop and asked Riggins about his travel plans. Riggins said that they were traveling from Houston, Texas to Monroe, Louisiana to visit Mr. Davis' family. Cahn then returned to his patrol car to run a check on Riggins' license and the license plates of the Versa and Expedition. Tr. 16. He also asked dispatch for a criminal history on Riggins. Tr. 19.

Wardell stopped the Versa shortly after Cahn stopped the Expedition. Wardell approached the Versa from the passenger side. Defendant Ricky Lawson was driving, and defendant Myrna Grays was in the passenger seat. Wardell asked Lawson if he was following the Expedition, and Lawson said that he was not. Lawson produced his driver's license, and Wardell asked him to stand at the rear of the vehicle. Tr. 84.

Wardell asked Lawson what he was doing in the area, and Lawson said something about gambling and Delta Downs in Shreveport. (Delta Downs is in Vinton, Louisiana, about 3.5 hours from Shreveport.) Wardell knew there is no Delta Downs in the area, so he asked Lawson if he was sure he was going to Shreveport. Lawson responded, "Last time we went to Florida." Tr. 85. Wardell asked if Lawson was perhaps going to Monroe instead of Shreveport, and Lawson again said Shreveport. Wardell did not believe that this was an honest answer because the Versa was 13 miles past Shreveport. Tr. 86.

Wardell asked Lawson if the car was registered to him. Lawson at first said yes, but then said the car was a rental. He told Wardell that the person who rented it was related

to his nephew. Tr. 86. Wardell went with Lawson back to the vehicle to retrieve the rental agreement, which indicated that it was rented by Mary Branham. Wardell asked Lawson if he knew the name of the person who rented the vehicle, and Lawson looked at Grays as if he did not know the answer. Grays said it was Mary, who was a friend of hers. Neither Lawson nor Grays was listed as an authorized driver of the vehicle. Tr. 87-88.

Wardell asked Lawson to return to the front of Wardell's patrol car. Based on Lawsons answers to Wardell's initial questions and the third-party rental situation, Wardell was suspicious that Lawson was not being honest. Wardell asked Lawson how far he has until he gets where he is going, and Lawson replied, "Motel." Wardell asked if maybe he was going to Louisiana Downs, and Lawson said that he was. But at the time Wardell stopped him, Lawson was already five miles past the (clearly marked) exit for Louisiana Downs. Tr. 90. Wardell returned to his patrol car to run his routine checks. Tr. 91.

Trooper Cahn contacted Trooper Wardell and told him that he had conducted an inquiry of the license plates of both vehicles, and both vehicles were seen on the same license plate reader (LPR) within ten seconds of each other in the Houston area. Wardell confirmed the LPR data. Cahn told Wardell that the occupants of the Expedition appeared to be deceptive. Tr. 17, 91.

Wardell told Cahn that the situation had become a criminal investigation and instructed Cahn to move his stop to Wardell's location. Tr. 92. Cahn had decided to search the Expedition due to the smell of marijuana. He told Riggins to drive to the location where Trooper Wardell had stopped the Nissan Versa, and Cahn followed. Tr. 20.

Wardell filled out a consent to search form and returned to Mr. Lawson at the front of the patrol vehicle. He asked Lawson if there was anything illegal in the Versa, and Lawson got flustered. Wardell asked again, and Lawson said he did not have anything illegal in the car. Tr. 94. Wardell asked Lawson if he could search the vehicle. Lawson responded, "You can't ask me … ask my wife." Gov. Ex. 3, Wardell Body Cam at 3:50:05-3:50:24; Tr. 94-95. Wardell asked Ms. Grays if she consented to a search of the vehicle, and she signed the consent form. Tr. 95.

By that time, Cahn had arrived at the scene with the Expedition and its occupants. Wardell indicated that he had consent to search the Versa, and the troopers searched both vehicles. They found a kilogram of compressed cocaine and one kilogram of suspected narcotics pills located in the trunk of the Versa. Tr. 21-22.

The troopers handcuffed the occupants of the Versa and moved on to the Expedition. They found about 14 to 15 grams of suspected marijuana under the console, a loaded pistol in a shoebox in the cargo area, several magazines of 9mm ammunition, and a box of sandwich baggies that contained a razor blade, a whisk, and a digital scale with suspected cocaine residue. Tr. 24-25. There was a backpack in the second-row seat that contained about $3,000 in cash. Tr. 25.

The four defendants were transported to Troop G for investigation. They were each read Miranda warnings. Tr. 128. Riggins agreed to answer questions. He (the driver of the Expedition) stated that he had no knowledge of the Versa or the narcotics in that vehicle. Tr. 118-119. Expedition passenger Davis stated that he and Riggins were traveling from Houston to Monroe to visit Davis' father. He admitted that he was a

convicted felon, and he said that the firearm in the vehicle belonged to his father. He also claimed ownership of the currency found in the backpack. Tr. 119.

Lawson (driver of the Versa) did not make a statement. Versa passenger Grays stated that she had been friends with Riggins for a long time and that she knew his mother. Riggins approached her and asked if she could rent a vehicle. She said she could not but that she could find someone who could. She paid Mary Branham $300 to rent the vehicle. Tr. 120. She, Lawson and Riggins left in the vehicle from her residence and drove approximately an hour to a gas station in Houston. Davis arrived at the gas station in the Expedition and Riggins got into the Expedition with Davis. Grays stated that she was under the impression they were going to a casino. Tr. 121. She claimed that she did not know the drugs were in the Versa. Tr. 130.

**The Motions to Suppress**

Lawson and Grays, the occupants of the Versa, argue that the traffic stop of the Versa was not justified at its inception and that the search of the Versa was not consensual. Grays further argues that the stop was unlawfully extended. Davis and Riggins, the occupants of the Expedition, argue that the initial traffic stop of the Expedition was not justified at its inception and that the stop was unlawfully extended.

**Law and Analysis**

### A. Initial Traffic Stops

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v. Ohio, 392 U.S. 1 (1968)." United States v. Rosales-Giron, 592 Fed. Appx. 246, 250 (5th

Cir. 2014); quoting United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007). "Under Terry, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id.

A traffic stop is justified at its inception when an officer has "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005) (citation omitted). "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." Id. Reasonable suspicion is a low threshold; it is not probable cause. United States v. Walker, 49 F.4th 903, 906-07 (5th Cir. 2022). "Certainly, then, if officers 'have probable cause to believe that a traffic violation has occurred,' then there is also reasonable suspicion to stop the vehicle." Id., quoting Whren v. United States, 517 U.S. 806, 810 (1996).

As to the Expedition, Cahn testified that he saw the Expedition cross the fog line twice in violation of La. R.S. 32:79, improper lane usage. Tr. 32. He captured the violations on his dashcam. Tr. 40-41. The Louisiana Supreme Court has held that crossing the fog line is improper lane usage in violation of La. R.S. 32:79. State v. Waters, 780 So.2d 1053 (La. 2001); United States v. Hernandez, 744 Fed.Appx. 873 (5th Cir. 2018) ("Because Hernandez's vehicle briefly touched the fog line, the state trooper had probable cause to believe a traffic violation occurred, and this reasonable suspicion justified the

traffic stop at its inception."). Accordingly, Cahn had reasonable suspicion to stop the Expedition, and the stop was justified at its inception.

As to the Versa, Trooper Cahn testified that he saw the vehicle commit several traffic infractions. When he first saw the two vehicles coming over a hill, Cahn saw the Versa accelerate and begin to follow the Expedition with about one car length between the cars. Tr. 9. This is a violation of La. R.S. 32:81, following too closely. Lawson points to the dashcam video of the traffic stop and argues that the Versa could not have been following too closely because the Versa was not close to the Expedition when the video starts. But Cahn testified that he followed the vehicles for about a mile prior to activating the dashcam, and during that time the Versa started following the Expedition at an appropriate distance. Tr. 74. Cahn also testified that he saw the Versa leave its lane and roll over the fog lane. This violation was captured on the dashcam. Tr. 75, Gov. Ex. 2 at timestamp 9:31:00-05.

Cahn told Trooper Wardell about the Versa's traffic violations. Tr. 11. Under the collective knowledge doctrine, an officer initiating a stop need not have personal knowledge of the evidence that gave rise to the reasonable suspicion so long as he is acting at the request of those who have the necessary information. United States v. McPherson, 630 Fed. App'x 330, 331 (5th Cir. 2016). Accordingly, Wardell had reasonable suspicion to stop the Versa for the traffic violations, and the stop was justified at its inception.

### B. Extension of the Stops

Under the second prong of Terry, an officer's actions must be reasonably related in scope to the circumstances that justified the stop. Terry, 392 U.S. at 29. An officer's

actions are not reasonably related if the officer detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless the officer develops reasonable suspicion of additional criminal activity in the meantime. United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). If the officer develops reasonable suspicion of additional criminal activity during the investigation of the circumstances that originally caused the stop, the officer may further detain the occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion. Id.; United States v. Aguilera, 2014 WL 7404535, at *3 (N.D. Tex.).

An officer may examine driver's licenses and vehicle registrations and run computer checks as part of the investigation of the circumstances that originally caused the traffic stop. United States v. Pack, 612 F.3d 341, 349-350 (5th Cir. 2010). The officer may also ask about the purpose and itinerary of the occupant's trip as part of this investigation, because these questions are considered to be reasonably related in scope to the investigation of the circumstances that caused the stop. Id. An officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as the unrelated questions do not extend the duration of the stop. Id.

As to the Expedition, Trooper Cahn testified that when he first approached the vehicle, the passenger window was rolled down and he could smell the odor of marijuana from within the vehicle. Tr. 13. The Fifth Circuit has consistently held that the smell of marijuana provides an officer with probable cause to conduct a warrantless search of a vehicle. See, e.g., United States v. Lork, 132 Fed. Appx. 34 (5th Cir. 2005) (detectable odor of marijuana emanating from a vehicle provides probable cause for the search of the

vehicle); United States v. Reed, 882 F.2d 147, 149 (5th Cir.1989) (Border patrol agent's detection of odor of marijuana alone would have justified search of vehicle). Based on the odor of marijuana in the vehicle, Cahn was justified in detaining the occupants of the Expedition until he could conduct a probable cause search of the vehicle.

As to the Versa, Trooper Wardell testified that when he first began speaking with Lawson was not able to give a clear explanation as to his travel plans. Lawson became flustered when trying to answer questions about his destination. Tr. 86. Lawson told Wardell that he was going to gamble at Delta Downs in Shreveport, but there is no Delta Downs in Shreveport. He had driver 13 miles past Shreveport. Tr. 85-86. The Versa was rented to a third party. Lawson said the renter was related to his nephew, but he was not able to tell Wardell the renter's name. Grays later said the renter was a friend of hers. Tr. 88. Neither Lawson nor Grays was listed as a driver on the rental agreement. Wardell told Lawson that he was suspicious that Lawson was being dishonest, and he asked Lawson to clarify some of the inconsistencies in his story. Lawson was not able to do so and instead became more flustered. Tr. 93-94. Based on the totality of these circumstances (including the indication that the Versa was traveling with the Expedition), Wardell had reasonable suspicion that Lawson and Grays were engaged in criminal activity, and he lawfully extended the stop to investigate.

### C. Search of the Versa

A consensual search is a well-settled exception to the warrant requirement. United States v. Navarro, 169 F.3d 228, 231 (5th Cir. 1999). In determining whether a search based upon consent is valid, the Government must prove that the search was voluntary and

that the defendant consented to the search. United States v. Jenkins, 46 F.3d 447, 451-452 (5th Cir.1995).

When Wardell asked Lawson whether he would consent to a search of the vehicle, Lawson responded, "You can't ask me … ask my wife." Tr. 3:50:05-3:50:24. Lawson and Grays argue that this constituted refusal of consent. At the hearing, counsel for Lawson asked: "And Mr. Lawson refused to give consent, correct?" Wardell responded, "Yes." Based on this testimony, Lawson and Grays argue that Wardell acknowledged that Lawson did not consent to the search and allege that Wardell was "occupant shopping" to find someone who would give consent.

The video of the traffic stop shows that while Lawson did not provide consent, he also did not deny consent. He did not answer the officer's question as to whether he consented. He instead deferred to Grays. Despite Lawson and Grays' attempts to characterize this deferral as a refusal, it is not. Wardell was not "occupant shopping" when it was Lawson who told him to ask Grays. Grays consented to the search. Accordingly, the officers conducted a lawful consensual search of the vehicle.

**Conclusion**

The troopers had reasonable suspicion to conduct the traffic stops of the Versa and the Expedition. Both stops were extended based on reasonable suspicion of additional criminal activity. The search of the Expedition was supported by probable cause, and the search of the Versa was consensual.

Accordingly,

It is recommended that the defendants' Motions to Suppress (Docs. 39, 44, & 45) be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 4th day of April, 2023.



Mark L. Hornsby
U.S. Magistrate Judge